Filed 1/11/16  P. v. Garcia CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>VICTOR GARCIA,<br><br>        Defendant and Appellant. | B256231<br><br>(Los Angeles County<br>Super. Ct. No. BA392358) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Leslie A. Swain, Judge.  Affirmed.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Mary Sanchez and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant and appellant Victor Garcia of one count of first degree murder. The jury also found true the special allegations that (1) Garcia committed the offense for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members within the meaning of Penal Code section 186.22, subdivision (b)(1)(C),[1] and (2) Garcia personally and intentionally discharged a firearm that caused great bodily injury or death within the meaning of section 12022.53, subdivision (d). The trial court sentenced Garcia to an aggregate prison term of 50 years to life.

Garcia challenges his conviction on three grounds. First, he argues that the trial court erred by refusing his request to instruct the jury on the lesser included offense of voluntary manslaughter. Second, Garcia contends that the court's failure to instruct the jury on "provocation and imperfect self-defense" violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution by effectively relieving the People of their burden of proving malice beyond a reasonable doubt. Finally, Garcia argues that the court erred by admitting People's Exhibit 20, portions of which, according to Garcia, included inherently prejudicial evidence. Because the record does not contain substantial evidence to support Garcia's theories of voluntary manslaughter based on provocation or imperfect self-defense, and any error in the admission of Exhibit 20 was harmless, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

Garcia is a member of the Breed Street gang, whose claimed territorial border falls between North Chicago Street and North Breed Street in Los Angeles. The Breed Street

---

[1] All undesignated statutory references are to the Penal Code.

2

gang is also known as "Breed," and its members sometimes make a hand signal in the shape of a "B" to denote their membership in the gang. Garcia's gang moniker is "Stomp" or "Stomper."

One of Breed Street's rivals is the Tiny Boys gang. Breed Street gang members use the derogatory term "Taco Bells" to refer to the Tiny Boys. The victim in this case, Miguel Chavez, was a member of the Tiny Boys.

At approximately 12:30 a.m. on October 9, 2011 Chavez returned home after attending a party. Chavez lived in a house on Michigan Avenue with his mother, Maria Lopez, his brother, Bryan Chavez, and his girlfriend, Kimberly Guevara. The house was within the borders of the Tiny Boys' "territory" and around the corner from North Chicago Street. About an hour later, Lopez and Guevara heard Chavez leave the house. Concerned that Chavez had been drinking, Lopez got up from her bed to go out and stop him. Before she could finish putting on her shoes, she heard six or seven gunshots. Guevara also heard gunshots within minutes of Chavez leaving, and she followed Lopez out of the house in the direction of North Chicago Street.

As the two women approached the intersection of Michigan Avenue and North Chicago Street, they saw Chavez holding on to a metal fence and slumping to the ground. From a distance of about 10 to 15 feet, they saw Garcia holding a gun. They did not see anyone else. They heard Garcia say "Fuck Tiny Boys" or "Fuck Taco Bell" as he turned to run away. Guevara testified that Garcia made a hand signal in the shape of a "B" as he was running away and that he said "Stomp" or "Stomper."

That same day Guevara went to the police station and gave a statement to Detective Ronald Chavarria. Detective Chavarria showed her a six-pack photographic lineup that included Garcia. Guevara selected the photograph in the number 1 position, Garcia, and she initialed his picture to indicate that he was the person she saw holding the gun that night. On the photographic identification report Guevara wrote, "somebody screamed Breed, than Stomper. Im not sure if is him cus as for me I dont knoe him but I got a feelin when I seen the photo number 1 in the paper." Guevara testified that she had never seen Garcia before that night. She later positively identified him in a live lineup.

3

Lopez did not speak to the police on the night of the incident. On November 4, 2011 Lopez went to the police station where the police showed her a six-pack photographic lineup. Lopez asked to see a live lineup because the person she had seen holding a gun near her son and running from the scene "seemed to be older" than the people in the photographs. In the live lineup, Lopez positively identified Garcia.

Lopez testified that she had seen Garcia on two prior occasions. She first saw him on September 19, 2011, approximately three weeks before her son's death. Lopez stated on that date she was walking near the intersection of Michigan and Chicago with her son Bryan, who is also a member of the Tiny Boys and goes by the moniker "Curly," when they saw Garcia on the opposite sidewalk. Lopez said that Garcia yelled to Bryan, "Curly, fuck Tiny Boys, you and your mom." Lopez testified that one week later she again saw Garcia, this time walking on Caesar Chavez Avenue, but neither of them spoke. At the preliminary hearing and at trial, both Guevara and Lopez identified Garcia as the person who was standing near Chavez with a gun on October 9, 2011.

Deputy Medical Examiner Cho Lwin performed an autopsy on Chavez and determined the cause of death was a single gunshot wound to the head. Dr. Lwin testified that the bullet entered the back of Chavez's head near the occipital lobe and exited near his right temple. He said the gunshot must have been fired from more than two to three feet away from Chavez because there was no soot or "stippling" on Chavez's body. Dr. Lwin also observed abrasions on Chavez's right knee and nose. He opined that Chavez received these "superficial" injuries when he fell down after he had been shot. He also said that, while the injuries could have been there before the shooting, they were not consistent with blunt force, such as a blow to the face.

The People charged Garcia with one count of murder (§ 187, subd. (a)) with a firearm use causing death and criminal street gang enhancements. (§§ 186.22, subd. (b)(1)(C), 12022.53, subd. (d).) The jury found Garcia guilty of first degree murder and found true both special allegations. The court sentenced Garcia to an aggregate sentence of 50 years to life. Garcia timely appealed.

4

# DISCUSSION

A.     *The Trial Court Did Not Err in Denying Garcia's Request To Instruct the Jury on the Lesser Included Offense of Voluntary Manslaughter*

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  Malice may be express or implied.  (§ 188.)  Express malice is an intent to kill, while implied malice is shown by a willful act with natural and probable consequences that are dangerous to human life where the actor knowingly acts with conscious disregard for the danger to life.  (*People v. Beltran* (2013) 56 Cal.4th 935, 941-942.)  First degree murder is a killing with express malice that is willful, deliberate, and premeditated.  (*Id.* at p. 942.)  Second degree murder is an unlawful killing with malice aforethought, but without the willfulness, premeditation, or deliberation that would support first degree murder.  (*Ibid.*)

Manslaughter is a lesser included offense of murder.  (*People v. Manriquez* (2005) 37 Cal.4th 547, 583 (*Manriquez*).)  A person who kills without malice does not commit murder.  A person who kills in the "heat of passion" does not do so with malice and may be guilty of manslaughter rather than murder.  (*People v. Thomas* (2013) 218 Cal.App.4th 630, 642 (*Thomas*).)  A killing in the heat of passion occurs if, " " " " "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." " " " "  (*Ibid.*)  Provocation arousing the accused's heat of passion may be physical or verbal, but the accused may not " " " "set up his own standard of conduct and justify or excuse himself because . . . his passions were aroused." " " "  (*Manriquez*, *supra*, 37 Cal.4th at pp. 583-584.)

" '[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence.' "  (*People v. Smith* (2013) 57 Cal.4th 232, 240.)  "The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the

5

greater." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 29.) "'[T]he existence of "*any* evidence, no matter how weak*" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.'" (*People v. Moye* (2009) 47 Cal.4th 537, 553 (*Moye*).) "'"Substantial evidence" in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]'" that the lesser offense, but not the greater, was committed.'" (*Ibid*.) "'"Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser included offense."'" (*People v. Valdez* (2004) 32 Cal.4th 73, 115.) We review de novo the question whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Walker* (2015) 237 Cal.App.4th 111, 115.) In so doing, we consider the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

The trial court instructed the jury on the definitions of first and second degree murder, including the requirement that the People prove malice. The court instructed the jury pursuant to CALCRIM No. 520 that to prove malice, the People had to prove, among other things, that Garcia "deliberately acted with conscious disregard for human life." The court instructed the jury, "If you decide that the defendant committed murder, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree."

With regard to first degree murder, the court instructed the jury, in relevant part: "The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and knowing the consequences, decided to kill. . . . A decision to kill made rashly and impulsively or without careful consideration is not deliberate and premeditated. . . . The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder, rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is, therefore, second degree."

6

Garcia asked the trial court to instruct the jury on voluntary manslaughter pursuant to CALCRIM No. 570.[2] The trial court denied Garcia's request, concluding there was "no evidence in the record" "to suggest that this was a manslaughter offense." The court stated that a "heat of passion manslaughter theory includes a finding that the defendant was provoked," and the record contained no "reasonable basis for finding that there was any provocation by the victim in the direction of the defendant." Garcia argues that the trial court's refusal constituted instructional error. He also argues that this error violated his federal constitutional rights by "remov[ing] a way for the defense to raise a

---

[2]     CALCRIM No. 570, "Voluntary Manslaughter: Heat of Passion-Lesser Included Offense," provides:
    "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.
    "The defendant killed someone because of a sudden quarrel or in the heat of passion if:
    "1. The defendant was provoked;
    "2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;
    "AND
    "3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.
    "[¶] . . . [¶]
    "In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.
    "It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.
    "[¶] . . . [¶]
    "The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

7

reasonable doubt as to whether malice was proved," thereby "ma[king] it easier for the prosecution to prove murder."

In support of his provocation theory, Garcia points to evidence that Chavez was "likely to" attack Garcia or that there may have been an altercation between them the night of the murder. Garcia contends that the totality of the circumstances supports "the inference that Chavez was armed or was disposed to engage [Garcia] in a fight or both." He cites the testimony of the People's gang expert, Los Angeles Police Department Officer Sergio Leyva, who described the general propensities of gang members to use violence to protect their turf and to arm themselves or have close access to weapons if a gang member suspects a rival will be in his gang's territory. Garcia then links this evidence to the victim's likely actions on the night of the murder by suggesting that Chavez knew that evening the Breed Street gang was "coming to play," a euphemism for looking for a fight.

The record, however, supports no such link. Detective Chavarria testified that Guevara, Chavez's girlfriend, overheard a conversation in which someone said that Breed Street was "coming." There is no testimony from Chavarria or Guevara regarding when Guevara heard this, whether Chavez knew anyone from the Breed Street gang was coming, or whether Chavez intended to act on or respond to this development. Moreover, Guevara testified that she in fact had no knowledge that "Breed Street was coming towards the Tiny Boys." To the contrary, the evidence suggests that Chavez left home that evening to go to a party, not to defend his gang's territory.

Garcia also argues that Chavez was likely to be armed, and the first shot Lopez heard could have come from a gun Chavez was carrying. There was no evidence, however, that Chavez carried a gun that night. The only gun identified at the scene was in the hands of Garcia, and all of the discharged cartridge cases found at the scene of the crime were fired from a single gun. Although Officer Leyva testified that Chavez had carried a weapon in the past, there is no evidence Chavez had a weapon on the night of his murder.

8

Finally, Garcia argues that the abrasions found on Chavez's body suggest that he had been in a fight before he was shot. Garcia points out that, although Dr. Lwin opined Chavez received these "superficial abrasions" when he fell after he was shot, Dr. Lwin conceded on cross-examination that the abrasions could have resulted from having been pushed or stumbling to the ground while running. There was no evidence, however, that Garcia and Chavez fought, even briefly, before Garcia shot him. There was no evidence of any shouting or fighting before Lopez and Guevara heard gunshots. There was also no evidence that Garcia sustained any injuries as a result of a fight with Chavez. And Dr. Lwin testified that Chavez was shot in the back of the head, not in the front of his body or head, as one would expect if he were fighting or threatening Garcia. Garcia's assertion that there was a brief altercation before Garcia shot Chavez is mere speculation. Garcia essentially concedes as much, by stating that "Chavez was likely to attack [Garcia]," Chavez "quite possibly" was armed that night, Garcia was "asking for an attack" from Chavez, and it was "highly likely" that Chavez "initiated or was a mutual participant in a violent encounter with appellant." Such speculation and assumptions do not constitute substantial evidence to justify giving an instruction on the lesser included offense of manslaughter. (See *People v. Valdez*, *supra*, 32 Cal.4th at p. 116 [evidence that there "may have been a struggle" between defendant and victim not sufficient to support second degree murder instruction].)

Indeed, nothing in the record supports Garcia's contention that he acted in the heat of passion or was provoked by Chavez. At most, the evidence may support a weak inference that Chavez exchanged a few words with Garcia before Garcia shot him. "[I]nsults or gang-related challenges," however, do not alone "induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter." (*People v. Enraca* (2012) 53 Cal.4th 735, 759; see *Manriquez*, *supra*, 37 Cal.4th at p. 586 [verbal provocation was insufficient to support instruction on voluntary manslaughter where the victim called the defendant "mother fucker" and challenged him to use a weapon].) The uncontested facts that Garcia voluntarily entered Tiny Boys' territory

9

armed with a handgun and shot Chavez in the back of his head within minutes of Chavez leaving his house further undermine any alleged provocation.

Because there was no substantial evidence that Garcia committed voluntary manslaughter, the trial court did not err by denying his request to instruct the jury on that offense. (See *Moye, supra,* 47 Cal.4th at p. 554 ["no principle of law required the trial judge below to disregard the evidence in order to find that the jury should consider whether defendant subjectively killed in the heat of passion, when no substantial evidence supported that theory of manslaughter, and the evidence actually introduced on the point . . . was to the contrary"]; *Manriquez*, *supra*, 37 Cal.4th at pp. 585-586 [instruction on voluntary manslaughter not warranted where verbal insults and taunts comprised "the only evidence of provocative conduct attributed to the victim" and were "plainly . . . insufficient to cause an average person to become so inflamed as to lose reason and judgment"]).

The trial court's failure to instruct on voluntary manslaughter arising from provocation also did not violate Garcia's constitutional rights by restricting his ability to create a reasonable doubt on the element of malice or by inaccurately instructing the jury on that element. Garcia relies heavily on *Thomas*, *supra*, 218 Cal.App.4th 630, where the court held that the failure to instruct the jury that provocation can negate malice was federal constitutional error. (*Id.* at p. 633.) In *Thomas*, however, there was evidence of a heated and violent argument between the defendant and the victim prior to the shooting, and the defendant testified at trial that the victim lunged at him after the defendant and a bystander had warned the victim to keep his distance. (*Id.* at pp. 634-639.) Given this evidence, the court held that the jury should have been instructed to consider whether the defendant killed in the heat of passion, which could defeat the element of malice. (See *id.* at p. 643 ["when a defendant puts provocation in issue by some showing that is sufficient to raise a reasonable doubt whether a murder was committed, it is incumbent on the prosecution to prove malice beyond a reasonable doubt by proving that sufficient provocation was lacking"].) Here, there was no evidence to support Garcia's theory that he was provoked into killing Chavez. Therefore, the trial court's refusal to instruct the

10

jury on provocation did not violate Garcia's constitutional rights. (See *ibid.* [duty to instruct on provocation arises only where there is a "showing . . . sufficient to raise a reasonable doubt" of murder].)

B. *The Trial Court Did Not Err in Failing To Instruct the Jury on Imperfect Self-Defense*

Garcia argues that the trial court's failure to instruct the jury on imperfect self-defense also violated his federal constitutional rights by "result[ing] in an incomplete definition of malice." Although Garcia did not ask the court to give an instruction on voluntary manslaughter based on imperfect self-defense, the trial court nevertheless had a sua sponte duty to instruct the jury if the evidence warranted such an instruction. (See *People v. Brothers*, *supra*, 236 Cal.App.4th at p. 29.)

"Imperfect self-defense, which reduces murder to voluntary manslaughter, arises when a defendant acts in the actual but unreasonable belief that he is in imminent danger of death or great bodily injury. [Citations.]" (*People v. Duff* (2014) 58 Cal.4th 527, 561-562; see *People v. Iraheta* (2014) 227 Cal.App.4th 611, 620.) Imperfect or unreasonable self-defense "'may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.'" (*People v. Randle* (2005) 35 Cal.4th 987, 1001, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201; accord, *People v. Enraca*, *supra*, 53 Cal.4th at p. 761; *People v. Frandsen* (2011) 196 Cal.App.4th 266, 272-273.) "Unreasonable self-defense is 'not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter." (*People v. Elmore* (2014) 59 Cal.4th 121, 134.)

Here, there is no evidence that Garcia believed he was in imminent danger of death or great bodily injury. Chavez was not armed and there is no evidence of any physical or verbal altercation that would have caused Garcia to believe he was in imminent danger of death or great bodily injury. Thus, Garcia was not entitled to an instruction on imperfect self-defense. (See *People v. Enraca*, *supra*, 53 Cal.4th at p. 761

11

[gang member who initiated assault cannot claim imperfect self-defense]; *People v. Wright* (Dec. 15, 2015, A139881) __ Cal.App.4th __, __ [2015 WL 8954616, p. 16] [instruction on imperfect self-defense not warranted where evidence presented no factual question whether victim's response to defendant's aggression was "unjustified or over the top" or whether defendant actually believed he was in imminent danger of being killed or greatly injured]; *People v. Ramirez* (2015) 233 Cal.App.4th 940, 948 [defendant who assaults victim with a gun may not show self-defense by claiming that he believed victim also reached for a gun].)

C.      *Any Instructional Errors Were Harmless*

Even if the court erred in failing to instruct the jury on provocation or imperfect self-defense, any such an error was harmless. Garcia argues that the applicable harmless error standard for the alleged instructional and constitutional errors is the one articulated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*): the failure to properly instruct the jury on a lesser included offense is reversible error unless the court can "declare a belief that it was harmless beyond a reasonable doubt." (*Id.* at p. 24; see *Thomas*, *supra*, 218 Cal.App.4th at p. 633 [*Chapman* applies to the failure to instruct on heat of passion in a murder trial where warranted by the evidence].) The People argue that the applicable harmless error standard for failing to instruct on provocation and imperfect self-defense, regardless of any constitutional violation, is the one set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*): a trial court's instructional error is harmless unless it is "reasonably probable" that the defendant would have obtained a more favorable outcome had the error not occurred.

Under either standard, failing to instruct the jury on voluntary manslaughter under either provocation or imperfect self-defense was not reversible error in this case because the jury could not have found Garcia guilty of the lesser offense of voluntary manslaughter. (See *People v. Gonzalez* (2012) 54 Cal.4th 643, 663, 666 [instructional error is harmless under *Chapman* where evidence could not lead rational jury to a contrary finding].) Garcia only speculated that Chavez might have provoked him and

12

presented no evidence of provocation to support his theory that he acted in the heat of passion or in response to a belief that he was in imminent danger or that Chavez was going to kill or injure him. In contrast, the People presented two eyewitnesses who identified Garcia as the shooter, one of whom testified that Garcia had threatened her and her family just weeks before the shooting. One of the eyewitnesses also testified that she heard Garcia identify himself using his gang moniker at the scene of the crime and "throw up" a hand symbol representing his gang. There was no evidence that anyone other than Garcia was present at the scene when Chavez was shot, and Chavez was not armed. Finally, Garcia shot Chavez in the back of the head from at least several feet away, not in the front of the body or at close range as one might expect if there had been a physical altercation. The record establishes beyond a reasonable doubt that a "'rational jury would have found the defendant guilty absent the error.'" (*Id.* at p. 663.)

D. *The Trial Court Did Not Commit Prejudicial Error by Admitting Exhibit 20*

To support the allegation that Garcia committed murder for the benefit of, at the direction of or in association with a criminal street gang, the People introduced evidence of a prior murder committed by Jonathan Gutierrez, a Breed Street gang member. Officer Leyva summarized the facts of the Gutierrez case and authenticated People's Exhibit 20, which contains 53 pages of minute orders from that case. The minute orders contain references to the last names of two additional defendants, including four references to "Defendant 03 Garcia." The trial court instructed the jury pursuant to CALCRIM No. 1403 not to conclude from the evidence introduced to prove the gang enhancement allegation that Garcia was a "person of bad character or that he has a disposition to commit crime."

Garcia argues that the admission of Exhibit 20 was prejudicial error because it suggested that Garcia had been a defendant in another murder. He argues that "[i]t is all but inevitable that one or more of [the] jurors would conclude that [he] was part of the Gutierrez case." Garcia also contends that Exhibit 20 gave the jury a "blueprint" of another gang murder trial in which the jury convicted the defendant of murder. Garcia

13

maintains that the limiting instruction of CALCRIM No. 1403 was insufficient to prevent the prejudice caused by the admission of Exhibit 20.

Garcia, however, did not object at trial to the admission of Exhibit 20. Therefore, he has forfeited his right to challenge the admission of the documents on appeal. (See § 1259 [appellate court may only review question of law upon "objection made in and considered by the lower court"]; Evid. Code, § 353, subd. (a) ["[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless . . . [¶] [t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"].) "[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.'" (*In re Seaton* (2004) 34 Cal.4th 193, 198; see *People v. Partida* (2005) 37 Cal.4th 428, 431 (*Partida*).) This rule applies to claims based on violations of constitutional rights. (*In re Seaton*, *supra*, 34 Cal.4th at p. 198.) As the Supreme Court explained, "[t]he objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal."'" (*Partida*, *supra*, 37 Cal.4th at p. 434; see *People v. Jones* (2013) 57 Cal.4th 899, 952 [defendant forfeited right to appeal admission of impermissible character evidence by failing to move to exclude the evidence at trial].) Had Garcia objected at trial to the admission of Exhibit 20, the People could have redacted the names of the other defendants mentioned in the document or proposed another measure to avoid any confusion or perceived prejudice. (See *People v. Lopez* (2013) 56 Cal.4th 1028, 1053 [redacting incriminating portions of documents can eliminate potential prejudice]; *Partida*, at p. 434 [specifying methods the proponent of contested evidence can take in response to an evidentiary objection in order to minimize the prospect of reversal].) Not having done so, Garcia cannot now argue that its admission was error.

14

Finally, even if Garcia had objected to the admission of (an unredacted version of) Exhibit 20 and the court had overruled the objection, any error would have been harmless. Garcia again argues that the more stringent harmless error standard of *Chapman* applies, even though "[a]bsent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test." (See *Partida*, *supra*, 37 Cal.4th at p. 439; *People v. Covarrubias* (2011) 202 Cal.App.4th 1, 21.) Under either standard, however, any error was harmless.

The People's case against Garcia did not rest on Exhibit 20. The People offered Exhibit 20 only in connection with the gang enhancement allegation. The references in the exhibit to a different person with the last name of Garcia were isolated, few and far between, and inconspicuously buried in a 53-page document. The trial court properly instructed the jury not to infer from the gang evidence that Garcia was predisposed to commit a crime. We presume the jury followed the limiting instruction absent some affirmative indication in the record that it did not. (*People v. Waidla* (2000) 22 Cal.4th 690, 725; *People v. Osorio* (2008) 165 Cal.App.4th 603, 618.) And the evidence of Garcia's guilt was very strong. There is no reasonable doubt that the jury would have found Garcia guilty of first degree murder even if (Garcia had objected and) the trial court had excluded Exhibit 20. (*People v. Gonzalez, supra*, 54 Cal.4th at p. 663; see *People v. Merriman* (2014) 60 Cal.4th 1, 78 [minor role of contested evidence at trial in combination with limiting instruction to the jury minimized prejudicial effect of potentially inflammatory evidence].)

## DISPOSITION

The judgment is affirmed.

SEGAL, J.

We concur:

PERLUSS, P. J.                                        ZELON, J.

15